# EXHIBIT A

*State Court Documents*

| | |
|---|---|
| State of South Carolina | ) IN THE COURT OF COMMON PLEAS |
| | ) |
| County of Greenville | ) 2021-CP-23- |
| | ) |
| Jane Doe, | ) |
| | ) |
| | ) Complaint |
| Plaintiff, | ) |
| v. | ) (Jury Trial Demanded) |
| | ) |
| Luxor Scientific, LLC and David List, | ) |
| | ) |
| Defendants. | ) |

Plaintiff, through her attorney, would respectfully show unto this Court as follows:

1.  Plaintiff is a resident of North Carolina but, at all times relevant to the facts underlying this Complaint, she was a resident of Greenville County, South Carolina. Plaintiff seeks to proceed anonymously as the matters discussed herein are sensitive and, given Defendant List's statements discussed below, there is serious concern about him attempting to harm her nascent career or that the discoverability of the pleadings could adversely affect her career regardless of whether List seeks to cause her further harm.

2.  Luxor Scientific, LLC ("Luxor") is a South Carolina limited liability company with a principal place of business in Greenville County. Luxor provides a variety of laboratory and medical testing services. Luxor was recently ranked 5th on the Fastest Growing Companies in South Carolina, a list of established companies with revenues of at least $100,000,000 in the past year.

3.  Defendant David List is, upon information and belief, a resident of Fairfield and Greenville counties.

1

ELECTRONICALLY FILED - 2021 Oct 14 11:44 AM - GREENVILLE - COMMON PLEAS - CASE#2021CP2304893

4.      Plaintiff is young graduate from college who obtained employment with Defendant Luxor as her first job after graduation.

5.      List is a middle aged, married man, who serves as executive director of sales and business development for Luxor.  List has been the top sales and business development executive at the corporation to whom all business development people have reported.  Upon information and belief, List reports directly to the CEO of Luxor, Ryan Flanagan.

6.      In or around December 2020, Defendants assigned Plaintiff to serve as List's executive assistant.

7.      From the time she began reporting to List, he would make inappropriate comments and suggestions to Plaintiff.

8.      To lure Plaintiff into a sexual relationship, List employed a variety of tactics ranging from psychological to a physical assault.

9.      One tactic, commonly referred to as "gaslighting," involved List's constant refrain that Plaintiff only had what knowledge, skills, and value that List imparted to her and that only he could help her achieve her career objectives.  While trying to diminish Plaintiff's self-confidence, List also would often attempt to lower Plaintiff's guard by stating that the sooner she "trusted" him, the sooner he could help her succeed in her career.

10.     List repeatedly made clear to Plaintiff that he completely controlled how much money she made and her career success.

11.     List also would seek to gain Plaintiff's attention by telling her that he needed validation and needed to have Plaintiff stroke his ego.  List would bizarrely tell Plaintiff,

ELECTRONICALLY FILED - 2021 Oct 14 11:44 AM - GREENVILLE - COMMON PLEAS - CASE#2021CP2304893

for example, that he "need[ed] some back end ego boost," and that her "learning to appease [him] is good for clients."

12. List's need to be "appeased" was a common refrain, and it grew from requests for attention to outright demands accompanied by threats. On one occasion, for example, List became angry when Plaintiff declined one of his invitations to travel on vacation with him. List told Plaintiff that he expected her to take the week to "appease" him, which he described as a "a skill you need for these offices." List admonished Plaintiff: "You seem to know now that I am an asset so why not appease the asset?"

13. As part of his mind games, List would tell Plaintiff that she hated him to coax her into trying to assuage him. List also would seek pity by offering Plaintiff money and telling her that he spent his money on other people because he wants to see other people happy since he hasn't been.

14. List claimed that was so disenchanted with his life that he was moving to Key West, that he was not taking his wife, and he asked Plaintiff if she wanted to go with him. List texted Plaintiff that, "Since my wife is out u can stay as long as u contribute," and "U can stay as long as u contribute monetarily or become my wife."

15. Even though List and Plaintiff had no personal relationship, List became angry and jealous when he saw Plaintiff's former boyfriend in a picture with her. List texted Plaintiff and told her that she should call List and he would pretend to be her boyfriend. Even after Plaintiff replied in a manner to make clear how inappropriate that was, List persisted in trying to discuss Plaintiff's ex-boyfriend.

16. List also subjected Plaintiff to regular disparagements of women, who List clearly saw as being beneath him. For example, List made repeated references to his

3

wife as a "hemorrhoid," as well as a "bitch," and a "cunt from hell." This conduct was a not-so-subtle effort at showing Plaintiff how unpleasant List can treat women who do not, in his terms, "appease him."

17. List also would demean women for their appearance and weight. He would tell Plaintiff, for example, that "purple on fat wom[e]n make them look like Barney," would criticize female applicants that have young kids, as well as those that "weigh more than [him]." List would also invite Plaintiff to bring female friends on trips he wanted to arrange, if they met his standards of what women should be:

> If u kill it u can bring your female friend as long as she's not a raging lesbo
>
> David List
> I am not dealing with that kind of shit.

All of this was part of List's effort to demean women and to assert his dominance.

18. To keep Plaintiff close to him, List rented a lake house for her that was close to his primary residence. List touted the rental lake house as a place at which they could party with Plaintiff's friends, who List repeatedly attempted to meet and with whom he repeatedly tried to socialize. List told Plaintiff that she would see great sunsets, that they could go boating together, and he described the setup as "a different high end life."

19. List was not subtle as to his intentions, telling Plaintiff that "I will be your work sugar daddy." List would boast that "I make 6 figures every month during covid," and that she needed to "understand and be available." On one occasion, List told Plaintiff he was making $125 per hour and that he would "let [her] spend some of that if [she] wanted to."

4

20. List would repeatedly either order gifts for Plaintiff or offer to pay for shopping trips for items such as clothing and a new phone. Even when Plaintiff questioned the propriety of List personally buying her gifts, List would attempt to impress Plaintiff by telling her that he was making so much money that the gifts were insignificant to him. List would expressly flaunt his wealth and income to convince Plaintiff that, in his own words, "I am a catch." To convince Plaintiff that he was "a catch," List would text her such comments as, "You know I make 650 an hour," and "I make 5000 a day during the week." List also told Plaintiff that "I can buy three vehicles and I love to help young people advance," "The suit[] I wore today was 3K  Let's find stuff u like that works," and "I know u think I am just a d bag but I make coin."

21. List's promises to shower Plaintiff was not without condition, as he texted her: "I will make millions and I don't care to spend so u are in during the right time if u adhere to my shit."

22. Apparently, the "shit" to which List expected Plaintiff to adhere included explicit sexual advances. On December 28, 2020, List sent Plaintiff almost 70 non-work-related texts, including the following:

> David List
> I don't mind stimulating pussy with my tongue
>
> David List
> Lol
>
> David List
> It's sad also bc girls your age don't have orgasmic action bc the guys suck and are 1-5 minute finishers

> **David List**
> At my age u better lock in for three orgasms in 45 minutes
>
> **David List**
> Like old guys take forever and that privileged info

23. Plaintiff never reciprocated or gave in to List. Because she was only 23 years old and in her first real job, Plaintiff did not know how to respond or what to do to stop List's conduct. List knew he was putting this young woman in an untenable and intolerable situation. In fact his actions were a transparent effort to upset and confuse her such that she would give in to his unsavory and despicable advances.

24. Plaintiff's efforts to ignore List's overtures simply led to an escalation of his harassment. One evening in January 2021, List came over to the house in which Plaintiff was staying, ostensibly for work-related reasons. List appeared to be intoxicated and helped himself to more alcohol once inside. List moved close to Plaintiff, causing her to become very apprehensive, especially as he had previously made his intentions clear. List and grabbed Plaintiff, putting one hand on her waist and the other hand on her buttocks. Plaintiff insisted that he leave.

25. List would invite Plaintiff to come to his house for dinner when his wife was out, would ask Plaintiff for an invite to drink with her, and he would ask her to go to sporting events or to concerts about which List knew Plaintiff would have an interest. Almost every invite included discussions about drinking alcohol.

26. List planned a "vacation," to the Keys to which he initially invited only his female subordinates. List stressed his expectations for drinking, "hard core" partying, boating and, "[t]aking care of my bass ass fuckers," referring to Plaintiff and her

6

coworkers. List's inappropriate comments and plans for a "vacation" involving only him and young females created an extremely uncomfortable situation. Once again, List was not shy about letting Plaintiff know what was on his mind. For example, in a text conversation in which Plaintiff let List know that she was at the gym, List responded: "You are working on that sand bar keys body. I dig it."

27. Throughout her employment, Plaintiff was uncertain and fearful of inciting the mercurial List, and their disparity in age, power, and experience left her confused and scared as to how she could deal with him effectively. Plaintiff's trepidation was well founded.

28. As part of his inappropriate plan for a "vacation" with Plaintiff, List tried to get her to ride alone with him to the Keys. Plaintiff told List she was not comfortable doing so and that she intended to drive herself. List became enraged and told Plaintiff to call the others who were invited and tell them the trip was off. "I will go myself then. Fly down. And do my own thing."

29. To make matters worse, List then expressly threatened Plaintiff for rejecting his invitation to ride alone with him to the Keys, and he made clear to her what her role as a woman was:

> **David List**
> So u are sure u want to go down this road
>
> **David List**
> U haven't thought this through very well. Until u don't need me u are going to entertain me

7

30. Although this greatly upset Plaintiff, she again tried to reason with List and salvage her young career. When Plaintiff told List that she wanted to discuss the matter, List continued his bizarre tantrum:

> **David List**
> Nothing is fair ever
>
> **David List**
> But at least I know where u stand now. Not what I thought but it's ok.
>
> **David List**
> Maybe I show tomorrow. Maybe not
>
> **David List**
> Either way this is bad.
>
> **David List**
> Nothing to discuss.

31. List also made clear that Plaintiff's position was imperiled by her refusal to be alone with him on what List planned to be an alcohol-infused non-work event:

> **David List**
> I think it's stupid of u to say u won't go on vacation I paid for and ride for 12 hours with me when u have many times before now – only to push me to pissed off and put yourself in a precarious position bc u do still need my help. NOT SMART

32. List then called Plaintiff and pleaded with her to ride with him, telling her that her reluctance to ride with him was "fucking stupid." List became weepy, telling Plaintiff that she was "special to" him, and that she "needed [him]." List continued to press that she needed to think about this, accused her of paying "hard ball" because she "didn't need" him. Again, this barrage was extremely upsetting to the young Plaintiff, who had

8

never had to deal with anything like this. But List would not relent until Plaintiff actually apologized to him repeatedly, even though she had done nothing other than to decline a ride from List, who had physically assaulted her and emotionally abused her for months.

33.     Even after Plaintiff told List she didn't mean to hurt his feelings and that she would ride with him, List said he was unsatisfied because he was concerned that her "tone" did not suggest that she was grateful to him. List then resorted again to his tactic of begging for pity, crying to Plaintiff that his life was a "fuck show," and that he had a problem "trusting people."

34.     In yet another not-so-subtle threat, List told Plaintiff that this issue "would linger," which was a particularly ominous threat coming from Plaintiff's boss who repeatedly reminded her that he controlled her financial and career destiny. Plaintiff repeatedly attempted to direct the conversation away from List's manipulative efforts. List acknowledged during the conversation not only that he had been drinking, but that Plaintiff had let him know that she was not interested in hearing about his personal life. Nonetheless, List continued a profanity-laced, and apparently alcohol-fueled, rant about his personal life.

35.     When all of List's manipulative tactics to gain Plaintiff's affections and her acquiescence to his sexual overtures failed, List simply refused to communicate with Plaintiff. In his self-pitying fashion, List told Plaintiff that he had "done what I can to show you the path," but that he "failed" with her. When Plaintiff tried to speak with him about his concerns to salvage her job, he responded that they "don't have anything to talk about."

36. All sales/business development people at Luxor report to List. List's refusal to engage Plaintiff as to business matters only made it impossible for Plaintiff to progress or succeed – a fact List never failed to make clear to Plaintiff.

37. Recognizing that her efforts to work directly with List have failed and that he was not going to allow her to succeed, Plaintiff reported List's conduct to Luxor's human resources. Plaintiff shared List's text messages and provided other information to Luxor.

38. Significantly, Plaintiff is not the only young female to have experienced List's conduct. Nor is she the only one to have reported it. Luxor knew or should have known of List's intentions and his propensity to harass young female employees. Because of the massive amount of money that List apparently was making Luxor, it did nothing to prevent or remedy the situation.

39. After Plaintiff complained about List's harassment, Luxor's focus was on squelching the information and silencing Plaintiff. Luxor instructed Plaintiff that she was not to discuss what happened with anyone. Luxor also effectively suspended Plaintiff immediately even though there has never been an allegation of wrongdoing on the part of Plaintiff.

40. In contrast to cutting Plaintiff off from her job, coworkers, and customer contacts, Luxor kept List actively employed throughout because, as noted above, apparently his ability to generate business outweighed any concern about the harassment he directed to young female employees.

41. Luxor failed to communicate with Plaintiff or to act promptly on her concern. Nor did it do anything to ameliorate the harm from its actions and the actions of List. For

the several weeks, Luxor did not even communicate with Plaintiff. All Plaintiff knew was that she was not permitted to work while List continued his employment unabated.

42. Luxor's actions, of course, sent a clear signal. The problem was not List or his conduct, but rather it was Plaintiff and her allegations that had to be excised from the workplace.

43. Luxor's actions interfered with and eliminated the possibility of Plaintiff succeeding as to the business she had been attempting to develop. These actions adversely affected Plaintiff's earnings, as well as her reputation in her field.

44. Luxor's suspension of Plaintiff also affected her relationships with colleagues, further affecting her standing and reputation in her field.

45. After about three weeks, Luxor started scheduling and then cancelling meetings with Plaintiff, again providing no information, guidance, or assistance.

46. After approximately a month of being suspended and with little to no communication from Luxor, Plaintiff accepted employment at another company.

**Count I**
**For A First Cause of Action**
**Assault**
**(Defendant List)**

47. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

48. Defendant List placed Plaintiff in reasonable apprehension of an offensive touching without her consent.

49. Defendant List engaged in such conduct intentionally or recklessly.

50. Plaintiff has suffered severe emotional distress as a result of such conduct.

11

WHEREFORE, Plaintiff requests a trial by jury on her assault claim and entry of judgment in an amount to be determined by the jury, but which should include nominal or actual damages, compensatory damages, and punitive damages, as well as any other relief shown to be appropriate including, but not limited to, costs and interest.

### Count II
### For A Second Cause of Action
### Battery
### (Defendant List)

51. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

52. Defendant List engaged in offensive touching of Plaintiff, without her consent.

53. Defendant List engaged in such conduct with the specific intent to harm Plaintiff or with reckless indifference to the likelihood of such harm.

54. Plaintiff has suffered severe emotional distress because of such conduct.

WHEREFORE, Plaintiff requests a trial by jury on her battery claim and entry of judgment in an amount to be determined by the jury, but which should include nominal or actual damages, compensatory damages, and punitive damages, as well as any other relief shown to be appropriate including, but not limited to, costs and interest.

### Count III
### For A Third Cause of Action
### Interference with Contract
### (Defendant List)

55. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

56. Plaintiff and Luxor were parties to an employer-employee relationship.

57.     Defendant List knew of the terms of the employment between Plaintiff and Luxor.

58.     Notwithstanding such knowledge, Defendant List intentionally interfered with Plaintiff's ability to earn income, procured the suspension of her employment, and caused, in part, the constructive termination of Plaintiff's employment relationship without justification.

WHEREFORE, Plaintiff requests a trial by jury on her claim of interference with contract and entry of judgment in an amount to be determined by the jury but which should include nominal or actual damages, compensatory damages, and punitive damages, as well as any other relief shown to be appropriate including, but not limited to, costs and interest.

### Count IV
### For A Fourth Cause of Action
### Intentional Infliction of Emotional Distress
### (Defendant List)

59.     Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

60.     Defendant List's actions constitute extreme, outrageous, atrocious, and utterly intolerable conduct.

61.     Defendant List had both actual and apparent authority over a plaintiff, as well as power to affect her interest, income, and livelihood, and career prospects.

62.     List also had inherent power given the disparity in age and his ability to attempt to manipulate and wear Plaintiff down psychologically.  Indeed, List's entire approach was to leverage the disparity in age and power that existed between himself and Plaintiff – a woman young enough to be his daughter.

13

ELECTRONICALLY FILED - 2021 Oct 14 11:44 AM - GREENVILLE - COMMON PLEAS - CASE#2021CP2304893

63. Defendant List acted with knowledge that Plaintiff was particularly susceptible to the emotional distress he inflicted upon her as evidenced by his observation of the distress she exhibited when subjected to his harassment, her statement to him that he was causing her anxiety, and her protestations.

64. Further, List's own manipulative statements make clear that he knew Plaintiff was vulnerable, because of her age and economic circumstances, and his continued harassment was specifically calculated to exploit those vulnerabilities.

65. Defendant List acted with a specific intent to harm Plaintiff.

WHEREFORE, Plaintiff requests a trial by jury on her claim of intentional infliction of emotional distress and entry of judgment in an amount to be determined by the jury but which should include nominal or actual damages, compensatory damages, and punitive damages, as well as any other relief shown to be appropriate including, but not limited to, costs and interest.

**Count V
For A Fifth Cause of Action
Invasion of Privacy
(Defendant List)**

66. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

67. List's constant inquiries and uninvited texts of an inappropriate nature, most of which occurred during non-working hours constitute an unwarranted intrusion into Plaintiff's private matters and into her privacy.

68. List's intrusion into Plaintiff's residence under false pretenses and his unwanted touching of her also constitutes an unwanted intrusion.

69. List expressly cited his authority and importance as Plaintiff's supervisor as justification for many of his intrusive text messages and statements. Likewise, List justified his actions and demands for acquiescence on the need for Plaintiff to defer to and "appease" her supervisor because of what he could do for her in terms of affecting her compensation and career prospects. Accordingly, Luxor is vicariously liable for List's unwarranted intrusion into Plaintiff's privacy.

70. Defendants' actions caused Plaintiff's humiliation, indignity, anxiety, and mental suffering.

WHEREFORE, Plaintiff requests a trial by jury on her claim for wrongful intrusion and entry of judgment in an amount to be determined by the jury but which should include nominal or actual damages, compensatory damages, and punitive damages, as well as any other relief shown to be appropriate including, but not limited to, costs and interest.

**Count VI**
**For A Sixth Cause of Action**
**Negligent Supervision & Gross Negligence**
**(Defendant Luxor)**

71. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

72. Luxor knew or should have known of List's conduct and behavior, which Plaintiff and likely others reported on prior occasions.

73. Luxor failed to take any reasonable steps to prevent or stop List's harassment, assault, and coercion of Plaintiff that has caused Plaintiff extreme emotional distress.

74. Luxor's actions have been willful and in reckless disregard of the rights of Plaintiff.

15

75. Luxor's actions have also caused injuries of a nonpersonal nature, such as lost wages and employment opportunities.

WHEREFORE, Plaintiff requests a trial by jury on her claim for negligence/gross negligence and seeks entry of judgment to redress their losses of liberty as well as any other relief to which Plaintiffs are entitled including, but not limited to, nominal and punitive damages, compensatory damages, injuries of a nonphysical nature such as lost earnings, pre-judgment and post-judgment interest and costs.

### Count VII
### For A Seventh Cause of Action
### Negligent Retention & Gross Negligence
### (Defendant Luxor)

76. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

77. List has engaged in a pattern of choosing very young, single women to be his "assistant" and in attempting to ply them and seduce them and/or coerce them into a sexual relationship.

78. Luxor knew or should have known of List's conduct and failed to prevent the foreseeable harm of his conduct towards Plaintiff.

79. Luxor's actions have also caused injuries of a nonpersonal nature, such as lost wages and employment opportunities.

WHEREFORE, Plaintiff requests a trial by jury on her claim for negligence/gross negligence and seeks entry of judgment to redress their losses of liberty as well as any other relief to which Plaintiffs are entitled including, but not limited to, nominal and punitive damages, compensatory damages, injuries of a nonphysical nature such as lost earnings, pre-judgment and post-judgment interest and costs.

**Count VIII**
**For An Eighth Cause of Action**
**Negligent Investigation & Gross Negligence**
**(Defendant Luxor)**

80.     Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

81.     Luxor undertook to investigate and address List's conduct, inducing Plaintiff to disclose sensitive information and to expose herself further to the wrath of Luxor's chief marketing and business development person.

82.     The manner in which Luxor failed to appropriately investigate and remediate List's harassment caused damage to Plaintiff's reputation, working relationships, both with regard to her colleagues and customers, which ultimately led to her constructive discharge.

83.     Luxor's actions have also caused injuries of a nonpersonal nature, such as lost wages and relocation expenses.

WHEREFORE, Plaintiff requests a trial by jury on her claim for negligence/gross negligence and seeks entry of judgment to redress their losses of liberty as well as any other relief to which Plaintiffs are entitled including, but not limited to, nominal and punitive damages, compensatory damages, injuries of a nonphysical nature such as lost earnings, pre-judgment and post-judgment interest and costs.

**Jury Demand**

Plaintiffs respectfully requests a trial by jury on all of the foregoing claims.

ELECTRONICALLY FILED - 2021 Oct 14 11:44 AM - GREENVILLE - COMMON PLEAS - CASE#2021CP2304893

ELECTRONICALLY FILED - 2021 Oct 14 11:44 AM - GREENVILLE - COMMON PLEAS - CASE#2021CP2304893

Respectfully submitted October 14, 2021.

                                                                  s/ Brian P. Murphy
                                                                  Brian P. Murphy, Bar No. 6770
                                                                  Attorney for Plaintiff

Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, SC 29601

18